[Civil No. 4237.   Filed March 18, 1940.]

[100 Pac. (2d) 167.]

R. A. WARD, Petitioner, v. ANA FROHMILLER, as State Auditor of the State of Arizona, Respondent.

Mr. J. R. McDougall, for Petitioner.

Ana Frohmiller, Respondent, *in propria persona.*

LOCKWOOD, J.—R. A. Ward, hereinafter called petitioner, applied for a writ of *mandamus* against Ana Frohmiller, as auditor of the state of Arizona, requiring her to approve certain claims for the travel

expenses of himself and J. R. McDougall in attending a conference of what is known as the Council of State Governments held on October 26, 27, 28, 1939, in San Francisco, to discuss various governmental problems, including migrants and migratory labor, relief and social security problems, with the representatives of Washington, Oregon, California, New Mexico, Idaho, Nevada, Colorado, Utah and Wyoming. He also asked that she be compelled to approve certain claims of Robert C. Parnell, in attending a meeting of the Civil Service Assembly, held in San Francisco at the same time, for the purpose of discussing methods and technique in the administration of the so-called merit system installed by the State Department of Social Security and Welfare, hereinafter called the state department. All of these trips were authorized, and the claims for expenses aforesaid were approved by the proper official of the state department. The claims were presented to the state auditor, who rejected them, and advised the state department as follows:

" . . . My reason for rejecting these claims is that travel to such conventions, conferences, assemblies, etc., is not authorized by the statutes of this state and this office seriously doubts whether a public purpose is involved."

The claims were again presented to and rejected by the auditor, and were then presented to the governor, who, having examined them, approved them *in toto,* and they were again presented to the auditor, but she refused to issue warrants therefor.

The question before us involves the powers and duties of the state auditor, under circumstances such as are set forth in the foregoing statement of facts.

The pertinent statutes governing the presentation and approval of claims against the state of Arizona, and the issuance of warrants therefor are found in

sections 28 and 2619, Revised Code 1928, which read as follows:

"2619. Presentation, approval and payment of claims. All claims against the state for an obligation authorized, required or permitted to be incurred by any state officer or. agency, and not payable out of any special fund, or in a special manner, shall be paid only in the following manner: The claimant shall present an itemized claim, sworn to by him and approved by the head official of each office or state agency under which the obligation was incurred, or by some other officer thereof, if expressly authorized to approve; then presented to the state auditor and, if approved by him, he shall draw his warrant therefor on the state treasurer, who shall pay the same when countersigned by the governor and only out of the appropriation made therefor."

"28. Auditing of claims; other duties. The auditor shall: 1. Audit, adjust and settle the amount of claims against the state payable out of funds of the state, except only such claims as may be expressly required by law to be audited and settled by some other officer, and investigate any claim presented. If such an investigation discloses that all or any portion of any claim is not for an actual public purpose, connected with the activities of the office, board, commission, or department where the claim originated, he shall refuse to draw a warrant, except for such amount of each claim as appears to be for an actual public purpose. He shall state his reasons for rejection to the originating office, and a warrant shall not be drawn therefor until a new claim, fully itemized, stating specifically the actual public purpose of, and the necessity for each particular item or amount of expenditure referred to in the auditor's statement of reasons, is presented to the auditor properly verified by the oath of the person making the expenditure, and again approved for audit and warrant by the officer, board, commission, or department which in the first instance audited the rejected claim. If such verified claim is not filed, or if re-filed, if it does not then appear that a public purpose is in fact involved respecting the claim thereof, the auditor shall have power to again

reject the claim, and report the fact of such rejection to the governor, and no warrant shall be drawn thereon, unless the governor specifically approves the claim in whole or in part.''

We have had the meaning and effect of these provisions under consideration in the case of *Proctor* v. *Hunt,* 43 Ariz. 198, 29 Pac. (2d) 1058, 1060. Therein we said:

''We are of the opinion that, construing all of these sections together, as of course it is our duty to do, in order to make them all effective, if possible, that when a claim is to be made for an obligation authorized or permitted to be incurred by any state officer or agency, which is not payable in some special manner, the claimant must execute an itemized claim, sworn to by him, which must be approved by the head official of the particular office or department by which the obligation was incurred. After this is done, it must be presented to the auditor, and, if it is, on its face, for a public purpose and is properly itemized and accompanied by vouchers, and an appropriation has been made by law for that purpose, it is the mandatory duty of the auditor to approve said claim and to issue a warrant therefor; no discretion being given, if the matters recited beforehand appear in the claim as presented. *Callaghan* v. *Boyce,* 17 Ariz. 433, 153 Pac. 773.

'' . . . In the present case, the various claims were approved by the Governor of Arizona, the head of the department for which the appropriations, which it is contended justified the expenditure of the money in question, were made. We think under these circumstances that unless it appeared upon their face that the claims, as approved by the Governor, were not in proper form or not for a public purpose, connected with the activities of the Governor's office, for which an appropriation had been made, it was the duty of the auditor, enforceable by *mandamus,* to issue a warrant therefor. If this is not true, and if the auditor must, at her peril, determine not only that the claim, on its face, was for a proper purpose and that there is an appropriation to pay it, but that the items of the claim were necessary and actually used for their

ostensible purpose, she must, by herself or her deputies, investigate every transaction of every department of the state government to the uttermost detail, before she dare approve a claim for the purchase of even a paper of pins. No officer could make a long-distance telephone call, however urgent, until he had first consulted with her as to its necessity and advised her of all its details, so that she might determine if it were for a public purpose. The tremendous cost of such procedure, and the manner in which it would hamper and delay the normal operations of the state government are obvious, and the appropriations made by the Legislature, from time to time, for the auditor's office, have been grossly inadequate for such a duty. Unless the Legislature explicitly so directs, we cannot conceive such to have been its intention. . . . We hold, therefore, that, unless it appears upon the face of the claims, approved by the Governor, and presented to the Auditor, that they were not in proper form, or not for a public purpose, no action lies against the auditor and treasurer for issuing and paying warrants for such claims, for the primary duty of auditing them is by section 2619, *supra,* placed upon the Governor, and he, and he only, is responsible if it appears, from evidence dehors the face of claims themselves that they were not, as a matter of fact, for a public purpose.''

Upon a re-examination and reconsideration of the two sections, we see no reason to depart from the construction placed on them in *Proctor* v. *Hunt, supra.* We hold, therefore, that if it appears from the face of the claims in the present case that they were in proper form and that the money claimed thereunder was expended for a public purpose, and they were properly approved by the head of the state department, it was the duty of the auditor to approve the claims and issue warrants.

Were the claims for a public purpose, within the meaning of those words as used in our statute? We think the natural and logical definition of the words

"public purpose" as so used is synonymous with "a purpose approved and authorized by law." Was the state department, therefore, authorized by law to expend its funds for the purpose of sending representatives to San Francisco to attend conventions of the character described herein?

It is not questioned that one presenting a claim against the state must show affirmatively a statute which directly, or by reasonable implication, authorizes the incurring of the charge. And in construing the statute, we must apply the rule that the intent of the legislature governs. In some cases that body has limited very strictly the powers and duties given a state department, and has gone into minute detail as to just how the appropriation for its support must be spent. In others the duties imposed are manifold and described in very general terms, while the appropriation is for a lump sum. The construction to be given a statute of the former kind is necessarily much stricter than that to be applied to the latter. The powers given are presumably correlated with the duties, and when the latter are far-reaching and set forth in broad language, it is but reasonable to assume, in the absence of a legislative expression to the contrary, that even though no express powers are described in detail, those conferred by implication are sufficient to permit the execution of the duties in the best possible manner. Practically all the authorities uphold this rule. 59 C. J. 973, and cases cited. The language used by the great Chief Justice in the famous case of *McCulloch* v. *Maryland,* 4 Wheat. 316, 421, 4 L. Ed. 579, 605, though written of the federal Constitution, logically applies to statutory construction as well:

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which

are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.''

The state department was created by chapter 69 of the regular session laws of 1937. Its duties are set forth in section 7 of the chapter, and among them we find the following:

''The State Department shall . . . (g) . . . develop plans in cooperation with other public and private agencies for the prevention as well as treatment of conditions giving rise to public welfare and social security problems; to make the necessary expenditures in connection therewith;''

It is a notorious fact, of which the courts cannot avoid taking judicial notice, that particularly during the last decade the problems which may properly be included under the head of ''public welfare and social security'' have grown enormously. Among these problems are old age assistance, home and work relief, outdoor, indoor and medical care for indigents, aid to dependent and crippled children and the blind. All of these are, by chapter 69, *supra,* placed in the hands of the state department for administration. The federal government contributes to the state department large sums for these purposes, and as a condition to such contribution requires that the latter maintain a suitable merit system. Due to the migratory habits of a considerable portion of the population of the United States, obviously it is utterly impossible for any state to deal properly with these problems without taking into consideration similar problems, and their complications, arising in other states, and endeavoring to work out a plan of action in harmony with like activities carried on by the sister states. These problems are to a great extent new, and only continued experimentation and the exchanging of ideas and information with similar officials in other jurisdictions can produce a satisfactory system of dealing with

them. That this was recognized by the legislature is shown by the fact that the state department was directed to "develop plans.in cooperation with other public and private agencies" to handle the many problems arising and, as we have pointed out, it is necessary for a successful handling of these problems that the plans should include agencies outside the state of Arizona. To limit the method of developing these plans to correspondence by mail or conversations by telephone would greatly hamper such cooperation and coordination, for it is well known that half an hour's personal interview between executives can accomplish far more than months of letter writing. We think, therefore, the reasonable construction of section (g), *supra,* is that the "other public and private agencies" include all those, both within and without the state, that are engaged in an endeavor to solve public welfare and social security problems, and that the state department is not only authorized but directed to take such steps as may be reasonably necessary to develop plans in cooperation with these other agencies, for the better solution of these problems. If this be true, then certainly attending a conference of representatives of the eleven western states, for the specific purpose of considering such problems as "migrants and migratory labor, relief and social security" and "civil service regulations" for the various agencies engaged in this work comes within the powers which the state department is directed to exercise.

The respondent apparently relies chiefly upon the cases of *Yavapai County* v. *O'Neill,* 3 Ariz. 363, 29 Pac. 430, *Webster* v. *Parks,* 17 Ariz. 383, 153 Pac. 455, and *Maricopa County* v. *Norris,* 49 Ariz. 323, 66 Pac. (2d) 258.

In the first case, the sheriff of Yavapai county presented a claim to the supervisors of that county for his expenses in traveling outside the Territory of Ari-

zona, for the purpose of (a) executing a warrant of arrest, and (b) of summoning witnesses residing outside of the territory. The court held that since a sheriff could not validly make an arrest outside the territory, it was not within his power to serve a warrant of that nature there, and his expenses in making the attempt could not be paid by the county. On the other hand, it held that subpoenaing of a witness was a duty which any messenger could perform, either within or without the territory, and that his mileage for notifying witnesses without the territory was a legitimate county charge.

If the representatives of the state department, in traveling to San Francisco, had been attempting to perform some official act which necessarily depended for its validity on its being done within the territorial jurisdiction of the officers, they could not collect the expenses of such a trip. But the acts which they performed, being those merely of consultation for the purpose of formulating a method of cooperation with outside agencies, were undoubtedly powers which could be validly exercised anywhere outside of the state of Arizona. The O'Neill case upholds the power of the state department in sending its representatives out of the state, rather than denies it.

In the Webster case the claim involved was one paid by the board of supervisors to one H. O. Tunis for expenses in attending an "Arizona Good Roads Convention" at Prescott. In that case the record did not show whether the attendance of Tunis was in an official capacity as a representative of the county, or merely as an interested private spectator, and there was nothing to indicate directly or indirectly that he was in the exercise of any official duty in attending such a convention.

In the present case the record shows clearly that the claimants were instructed by their official superior

to attend the conventions in question, to discuss with representatives of similar bodies from other states some of the problems in regard to which the state department was specifically directed by the legislature to develop plans in cooperation with other public agencies.

In the Webster case, if the board of supervisors had been instructed to develop plans in cooperation with other private and public agencies for good roads in Arizona, which should be a part of a nation-wide system, financed in part by the Federal government, we think there could have been no doubt that the expense of sending a representative of the board to a convention, within or without the state, would have been a legitimate, proper, and, indeed, necessary public purpose.

In the Norris case the officer was given a bench warrant to serve in Missouri on a fugitive from justice. We pointed out that, as in the O'Neill case, the warrant was void outside of the state, and that the law had provided another way of returning fugitives from justice, which was exclusive. In the present case, no such situation exists. None of the Arizona cases cited are in point.

If the general purpose be one authorized by law, the question of whether the particular activity is reasonably necessary under the circumstances is primarily for the head of the department to decide, subject to a review by the courts for abuse of discretion. In the Proctor case, *supra,* we said:

"In examining these items, it is apparent that in many cases the particular subject-matter of the claim may or may not be used for a public purpose. We think, therefore, that the rule that it is presumed a public officer will do his duty applies, and that the auditor and the treasurer, when it appears a claim is for an item which may or may not be for a public purpose, according to the way in which it is used, are

entitled to presume that the head of the department has applied the article to the public, and not to the private, use, and are not responsible, unless there is something on the face of the claim which should advise them that the use is private and not public."

Following this rule, we are of the opinion that the presumption was that the state department used a reasonable discretion in sending representatives to the meetings in question; that the amount of money for which the claims were made out was a reasonable expenditure for those purposes, and was actually so expended. The responsibility for determining whether these things are true is not placed by the law upon the auditor, but upon the head of the department who approves the claim. If, as a matter of fact the discretion was abused, or the money not spent for the purpose indicated by the claims, the remedy of the state is ample. If the claims have not already been paid by the treasurer, injunction proceedings will lie against the latter, during which all of the true facts may be presented to and determined by the court. If the claims have already been paid, the responsible head of the department approving them and his bondsmen are forever liable to the state for the illegal expenditure, in a proper action brought to recover the money (*Proctor* v. *Hunt, supra*), for the statutes of limitation do not run against the state.

It may be urged that even though the purpose for which the claims were presented is a public one, no money was appropriated by the legislature for the payment of such claims, and that, therefore, a warrant may not be issued. It is, of course, true that even though authority be given to incur indebtedness, unless an appropriation is made the auditor may not issue her warrant, but merely gives to the claimant a certificate of indebtedness, under the provisions of section 35, Revised Code 1928. We think, however, that

section 15 of chapter 69, *supra,* as amended by chapter 3 of the third special session of the thirteenth legislature, appropriates many thousands of dollars for the "expenses" of the department, which of course includes legitimate travel expenses, and it is not claimed this fund is exhausted.

Since the claims, as presented, showed on their face that they were for a public purpose, and were duly approved by the proper head of the state department, it was the duty of the auditor to approve them, unless it should appear that the appropriation for that purpose has been exhausted. There is no contention that this is the case.

The case might have been disposed of by the last sentence of subdivision 1, section 28, *supra,* but as a failure to determine whether the claims showed on their face they were for a public purpose would probably have meant further litigation, I thought best to discuss only that feature of the case, leaving to Judge McALISTER the statement of our conclusion as to the meaning of the sentence above referred to.

The alternative writ will be made permanent.

McALISTER, J. (Specially Concurring).—I concur in the conclusion announced by Justice LOCKWOOD. There is no question in my mind but that it was the duty of the auditor under the provisions of section 28, Revised Code of 1928, to draw warrants for the claims presented by the petitioner, R. A. Ward.

That section provides that when a claim presented to the auditor is not for an actual public purpose connected with the activities of the office, board, commission or department where the claim originated, the auditor shall refuse to draw a warrant, except for such amount of the claim as appears to be for a public purpose. It then requires the auditor to state his reasons for rejection to the originating officer and

provides that a warrant shall not be drawn therefor until a new claim fully itemized, etc., is presented to the auditor properly verified by the person making the expenditure and again approved for audit and warrant by the officer, board, commission or department which in the first instance audited the rejected claim. When this situation presents itself the auditor's power regarding the claim is described in the following language:

"If such verified claim is not filed, or if re-filed, if it does not then appear that a public purpose is in fact involved respecting the claim thereof, the auditor shall have power to again reject the claim, and report the fact of such rejection to the governor, and no warrant shall be drawn thereon, unless the governor specifically approves the claim in whole or in part."

The record discloses that the claims in question were rejected by the auditor when first presented to her, for the reason that they were not, in her opinion, for a public purpose, and that new claims for the same items were presented to her a second time, whereupon she again rejected them for the same reason. She then reported the fact of her rejection to the governor who, believing them to be for a public purpose, approved them in full and reported his action to the auditor, but, notwithstanding the approval of the governor, she declined to draw warrants in payment of them. Evidently the auditor felt that even though the governor believed the claims were for a public purpose and approved them, they were not such in fact, and, hence, that it was still her duty to decline to draw the warrants. In this I think the auditor took a position the statute does not uphold, and this is true whether the claims were or were not in fact for a public purpose.

It is plain that when the auditor rejects a claim a second time she is required to report the fact of her

rejection to the governor and when this is done that "no warrant shall be drawn thereon, unless the governor specifically approves the claim in whole or in part." This means, if I understand its import, that if the governor does approve the claim a warrant shall be drawn in payment of it. To my mind the meaning of this expression would have been no clearer if the legislature had added to it the following or similar language, "in which event a warrant in payment of the claim shall be drawn." If this is not true, there would be no purpose whatever in requiring the auditor to report her rejection to the governor, for it would mean that the legislature has compelled the auditor to perform a wholly useless act.

It is clear that the law-making body intended to confer upon the chief executive the power to determine whether claims twice rejected by the auditor are for a public purpose and, if he concludes they are and approves them, to make that approval effective by requiring the auditor to draw a warrant in payment of them, provided there are funds for that purpose, or in case there are none, to issue a certificate of indebtedness. After approval by the governor the duty resting upon the auditor relative to the claims is purely ministerial. It is no longer within her discretion to reject them or to decline to draw warrants in payment of them. In *Winsor* v. *Hunt*, 29 Ariz. 504, 243 Pac. 407, it was held that when the auditor approves a claim the governor's duty to countersign it is ministerial and can be compelled by *mandamus*, so when the governor approves a claim twice rejected by the auditor her duty to draw a warrant in payment of it is likewise ministerial and can be compelled in the same manner.

The legislature evidently intended to place the responsibility for the payment of such claims squarely upon the shoulders of the governor and relieve the

auditor completely of it. The requirement that that officer shall report her second rejection of a claim to the governor gives the claimant, in effect, an appeal from the decision of the auditor to the chief executive, the officer upon whom the law has placed the final decision as to the validity of twice-rejected claims. To hold that the auditor may or may not, as she thinks proper, draw warrants in payment of such claims would, practically speaking, be the same as holding that the superior court may use discretion in carrying out the mandate of the Supreme Court in any case in which it has reversed the decision of that court. Under this procedure if some interested party should, after issuance, attempt to enjoin the treasurer from paying the warrant or should, following its payment, seek to recover the money from the person to whom it had been paid or from the head of the department who had approved the claim, upon the theory that it was not for a public purpose, as would be his·right, and succeed, no blame whatever would rest upon the auditor for paying the claim, even though it should be later held by the court that it was not for a public purpose.

ROSS, C. J., Dissenting.—I do not concur. It seems to me that it is necessary to look into chapter 69, which creates the State Department of Social Security and Welfare, and see what its provisions are concerning travel and other expenses of board members and employees. Justice LOCKWOOD quotes a portion of subdivision (g) of section 7 of the act and concludes therefrom that the petitioner should have the relief he has asked for. Chapter 69 creates a new agency of state government. Its general aim is to provide for those unfortunate persons in Arizona not able, on account of age, or blindness, or sickness, or other infirmity to care for themselves. It provides that this

State Department shall consist of a State Board and a Commissioner of Social Security and Welfare and such other officers and employees as may be authorized. Section 2. It authorizes the governor to appoint to the state board five members on the basis of recognized interest and knowledge of the problems of public welfare. Section 3. The board is empowered to appoint a commissioner at a salary of not to exceed $4,800 per annum, who shall be the executive officer and shall discharge the executive duties of the department, subject to the authority of the state board. Section 4. The commissioner is made the secretary of the board and is empowered, subject to the approval of the board, to appoint such personnel as is necessary to perform the duties prescribed in chapter 69. Section 7 enumerates the functions and duties of this agency of state government. Subdivision (g) of such section reads as follows:

"Section 7. . . . The State Department shall: . . . "(g) Carry on research and compile statistics relative to the entire public welfare program throughout the state, including all phases of dependency, defectiveness, cooperate with the superior courts in cases of delinquency and related problems; and develop plans in cooperation with other public and private agencies for the prevention as well as treatment of conditions giving rise to public welfare and social security problems; to make the necessary expenditures in connection therewith."

Section 8 empowers the state board to classify employees under civil service and to formulate salary schedules, etc. Section 14, and section 15 as amended by chapter 3, Third Special Session, Laws of 1937, read as follows:

"Section 14. Duties Of State Board. It shall be the duty of the State Board to supervise, control and administer as a board the Old Age Assistance Act of 1937, the Assistance to Needy Blind Act of 1937, and

the Assistance to Dependent Children Act of 1937, according to the authority conferred in the respective acts and given to such State Board."

"15. State And County Boards; Appropriation; Expense; Distribution. There is hereby appropriated to the state and county boards, for the twenty-sixth fiscal year, the sum of one thousand dollars. The expenses of the state and county boards shall be paid out of said appropriation and out of funds made available by the old age assistance act of 1937, the dependent children's act of 1937, the needy blind act of 1937, and out of the welfare fund, provided that such expense shall not exceed five per cent of the old age assistance funds and twelve per cent of all other funds administered hereunder for any one fiscal year."

"The expenses of the state and county boards" in supervising, controlling and administering old age assistance, assistance to needy blind and assistance to dependent children (chaps. 70, 71 and 72, Laws of 1937) are to be paid from the appropriations made for such assistance. These expenses of administration, aside from those mentioned in subdivision (g) *supra,* are the salaries of the commissioner and the personnel, which is a considerable sum, since the force needed to administer the different welfare acts is very large. The only provisions in chapter 69 as to travel and other expenses I quote *verbatim.* In section 3 is found this language:

"Members of the State Board shall receive no compensation for their services other than the amount of their traveling and other expenses actually incurred while in the performance of their official duties."

Section 10 (d) authorizes the county board to employ a full-time secretary and such other employees as may be necessary to discharge its duties. In reference to this board, it is provided in section 10 (a):

" . . . The members of each County Board shall serve without pay, except that they shall receive neces-

sary traveling expenses while in the discharge of the duties imposed upon them by the State Board.''

Thus it is seen that the act creates two units to administer the public welfare. One is the State Department, which is ''charged with the administration of all the welfare activities of the state'' (section 7), and the other the County Board, whose duty it is

'' . . . to assist the State Department in the administration of welfare and relief work in their respective counties; to keep the State Department fully informed with respect to social welfare conditions therein; to cooperate with local private relief, welfare, and charitable organizations; to advise county and municipal authorities on questions of welfare, relief, distribution of funds, and social security, and generally, with the approval of the State Board, to do things necessary and proper, within their respective jurisdictions, to carry out the purposes of this Act.'' Section 10 (c).

One's jurisdiction is coextensive with the state and the other's with the county.

The majority of the court has cut subdivision (g), *supra,* into two parts and adopted the last half thereof as a source of authority for the charges made by petitioner and his assignors. I think the whole subdivision should be considered together. It pertains to the same general subjects. It states that the state board shall do certain things ''throughout the state'' and cooperate with the superior courts of the state on certain welfare problems, and ''develop plans in cooperation with *other* public and private agencies'' etc. Now, pray, what are the other public and private agencies? The context shows that they are agencies having to do with the public welfare of the state. They are agencies operating in the state whose business or duty it is to ascertain the causes calling for relief and to prescribe treatment therefor. Public agencies with which the board is directed to plan are

such as the county and city hospitals, schools for the deaf and blind, county and municipal authorities, etc., and the private agencies are such as the Salvation Army, Sisters of the Good Shepherd, Florence Crittenden Home, Volunteers of America, etc. These are local agencies in close touch with the various problems of welfare and social service and are comprehended in the phrase "other public and private agencies," and are types of service mentioned in the forepart of subdivision (g). The "conditions" in the state, and not outside the state, are the conditions which the state board is empowered to investigate and treat in cooperation with the public and private agencies of the state and "to make the necessary expenditures in connection therewith." Again, the word "other" in subdivision (g) refers to agencies of the same general nature and class as to location and quality as those enumerated in the phrase preceding it. This is a rule of construction that has been adopted and followed by this court.

In *Conrad* v. *Maricopa County,* 40 Ariz. 390, 12 Pac. (2d) 613, 614, we said under

"the well-known rule of *ejusdem generis,* to the effect that when general words follow the enumeration of particular classes, the general words will be limited to persons or things of the class to which the specific words belong. . . . "

In *White* v. *Moore,* 46 Ariz. 48, 46 Pac. (2d) 1077, 1081, we reaffirmed the above rule and added this, from 25 Ruling Case Law 997, with approval:

"In accordance with the rule of *ejusdem generis,* such terms as 'other,' 'other thing,' 'others,' or 'any other,' when preceded by a specific enumeration, are commonly given a restricted meaning, and limited to articles of the same nature as those previously described. . . . "

The expenditures authorized by subdivision (g), then, are limited to welfare activities in the state.

It seems to me that to give to subdivision (g) the meaning ascribed to it in Justice LOCKWOOD'S opinion is imputing to the legislature an intention not to be found in its language and not deducible therefrom under rules of construction heretofore promulgated by this court. It would have been a very easy matter for that body to have provided for the appointment of representatives to conferences held in San Francisco, or Washington, or Chicago, and fixed their number and provided that their travel and other necessary expenses should be a charge against the state, but it did not. Who is to say, under such circumstances, who or how many may attend which out-of-state meetings, and how often, at the expense of the state? May the members of the board attend and also the officers of the board and its employees? The legislature has not delegated the power to anyone to appoint persons to represent the state department at such meetings.

It appears that petitioner Ward is a member of the state board and that McDougall and Parnell, whose claims are assigned to Ward for the purposes of this proceeding, are employees of the state department. It also appears that their authority to go to San Francisco came from "their official superior" (See opinion of Justice LOCKWOOD). It is alleged in the petition that the commissioner, Harry W. Hill, instructed these parties to attend the San Francisco meeting and I suppose he is the "official superior" referred to. Chapter 69 authorizes the state board to appoint a commissioner who shall have charge of the state welfare activities, subject, however, to the will of the state board (sec. 4). I should say if anybody was empowered to appoint delegates to meetings of voluntary associations outside of the state, it is the

state board. It is not suggested the state board made such appointment. In any event, such board had no more power to appoint delegates to out-of-state vagrant meetings than the commissioner had. The petitioner must recover, if at all, on the basis that the law itself authorized him and his assignors to make the trip at the state's expense.

How about the implied prohibition against members of the board receiving travel and other expenses as contained in the following language:

"Members of the State Board shall receive no compensation for their services other than the amount of their traveling and other expenses actually incurred while in the performance of their *official duties.*" Section 3. (Italics mine.)

The question is, where does a member of the state board perform his "official duties"?

His *official duties* are performed in the state and not elsewhere. He is not an official except by his appointment and beyond the boundaries of the state his certificate of appointment is just a piece of paper. It gives him no authority whatever to represent the state when he goes abroad. The authority of an officer outside his state, if he has any, must be expressly conferred. We quote 46 Corpus Juris 1032, section 288:

"When the law confers upon a person powers that he, as a natural person, does not possess, that power cannot accompany his person beyond the bounds of the sovereignty which has conferred the power, and although the legislature may require certain official acts to be done beyond the state's limits, such acts are done by its *express permission* and the power cannot be implied." (Italics mine.)

The decisions of this court are in accord with the above statement from Corpus Juris. *Yavapai County* v. *O'Neill,* 3 Ariz. 363, 29 Pac. 430; *Maricopa County*

v. *Norris,* 49 Ariz. 323, 66 Pac. (2d) 258, 259. In these cases officers of the state were claiming compensation or expenses for executing warrants outside of the state and we said, in *Maricopa County* v. *Norris, supra:*

"This court, in *Yavapai County* v. *O'Neill,* 3 Ariz. 363, 368, 29 Pac. 430, 433, held that the law conferred upon the sheriff the power to execute a warrant of arrest 'anywhere within the territory; but of course,' we said, 'the warrant would have no extraterritorial vitality.' Continuing, we said:

" 'A warrant of arrest issued out of any court in this territory cannot be executed, in a legal sense, outside of the territory. Whatever was done in Utah in the way of pursuit and capture was not there done, and could not there be done, in the execution of the writ, for there the writ was not a writ. It is our conclusion, then, that no fee can be, under the statute, charged for travel beyond the territory, in the execution of a warrant of arrest; and to the extent that such fees were allowed, the judgment of the lower court is erroneous.'

"The bench warrant for the arrest of Vogel in the hands of appellee after he got out of Arizona was nothing more than a piece of paper. He could execute it in Arizona but not in Missouri nor any point between the boundary of this state and St. Louis. We have no law making it the duty of the probation officer to go out of the state and half way across the continent to get a fugitive on the order of a judge of one of our courts."

Petitioner did not go to San Francisco in his official capacity and cannot recover. If he contends he went in his private capacity, he may not recover his expenses for these are recoverable only when incurred in the performance of his "official duties."

It seems the legislature, in providing that members of the state board should be paid their necessary expenses, including travel, "while in the performance of their official duties," in effect, directed that travel

and other expenses should be allowed no person except when incurred on official business. This conclusion is based on the well-known maxim. ''The expression of one thing is the exclusion of another.'' The legislature, in chapter 69, enumerates just who may travel at the expense of the state, and those enumerated are the members of the state and county boards, who, it is provided, may have their necessary expenses incurred while on official duty. The selection by the legislature of those who may travel at the state's expense excludes all others from that privilege. This rule of construction is stated and illustrated in 25 Ruling Case Law 981, section 229, as follows:

''It is a general principle of interpretation that the mention of one thing implies the exclusion of another thing; *expressio unius est exclusio alterius*. The affirmative description of the cases in which the jurisdiction may be exercised implies a negative on the exercise of such power in other cases. The enumeration of certain powers in a statute relating to corporations implies the exclusion of all others not fairly incidental to those enumerated. Enumeration in a charter of incorporation of the purposes for which the corporation may acquire title to real estate is necessarily exclusive of all other purposes. A statute directing a thing to be done by a specified officer or tribunal implies that it shall not be done by a different officer or tribunal. A statute that directs a thing to be done in a particular manner ordinarily implies that it shall not be done otherwise. . . . ''

This should clearly be the rule except that expenditures under subdivision (g) may include travel and other expenses in the state by the members and employees of the state board, and travel in the county by the members of the county board and officers thereof in the discharge of their ''official duties.'' If their investigations under subdivision (g) require travel in the state or county and clerical help, then

I think such expenses would be a legitimate charge under such subdivision.

It is admitted that the legislature has not *expressly* conferred authority on anyone to attend the Council of State Governments, or conferences of other voluntary organizations, in San Francisco, or elsewhere outside of the state. In *Austin* v. *Barrett,* 41 Ariz. 138, 16 Pac. (2d) 12, 13, the question was whether members of the board of supervisors of Maricopa county were entitled to charge mileage to the county for travel from their residences to the county seat. We held that such mileage was not a legal charge and, among others, gave the following reasons:

"The first and principal rule to be followed, in determining whether a claim against a county is legal, is that the person making the claim must show some statute affirmatively authorizing it, either directly or by reasonable implication. *County of Santa Cruz* v. *Barnes,* 9 Ariz. 42, 76 Pac. 621. And the right of an officer to demand expenses incurred by him in the performance of his official duty is no exception to the rule. *Mackenzie* v. *Douglas County,* 81 Or. 442, 159 Pac. 625, 1033; *Parsons* v. *Waukesha County,* 83 Wis. 288, 53 N. W. 507. All other considerations are subordinate to these.

. . . . . . . . . .

"We also find that in the biennial appropriation bills providing for the expenses of conducting state offices, the Legislature has practically invariably included specific items covering the expense of travel for those officers whose duties necessarily require that they go from their official headquarters to various places *within the state,* while carefully omitting any such items for those officers whose duties are performed in one place, such as the state auditor since 1923 and members of this court since its organization.

"If it were the intent of the Legislature to allow for traveling expenses of the nature involved herein, it is strange that nowhere in the Code did it *specifically provide* therefor, nor have we been cited to any

decision of another state where such an expense is held a legal charge in the absence of a statute *expressly* covering such an item.'' (Italics mine.)

The application of our language in the above case to the situation we have here shows that the petitioner's claims should not be allowed since they are not specifically provided for, nor has our attention been called to a decision of another state where such expenses have been held to be a legal charge in the absence of a statute *expressly* covering such item.

Probably the reason the legislature did not provide for the expenses of trips out of the state by the members of the state board, its officers and employees was that it preferred that the money be devoted to the objects for which it was collected, to wit, for relief of persons in need, for old age assistance, aid to dependent children and to the blind, and services to crippled children, etc.

Just what may happen if the state board is given a free hand is illustrated by the respondent's answer to the petition. The answer shows that six persons from such board, and not three as appears from the petition, attended meetings in San Francisco at or about the same time, and that their expenses amounted to $523.05 instead of the $194.26 involved in this action. If six representatives may attend, six times six may. To me it is absurd to believe the legislature intended to confer the power on any of its agencies to spend tax money *ad libitum* for trips out of the state to meetings, at the best, of doubtful usefulness.

The legislature is the branch of the government authorized to lay taxes. It is up to it to provide the money to meet the expenses of government. It is through and by it that taxes are levied, collected and paid into the state treasury. Also, it is the only body empowered to fix the terms and conditions upon which tax money may be withdrawn from the treasury.

The difficulty is to get tax money into the treasury and not to get it out. The latter process seems all too easy. It seems to me, if the legislature fails or refuses to give the keys to the vaults of the state treasury by express provision, we should not by our decision deliver them over to any body or agency.

The expenses charged by petitioner and his assignors were no doubt incurred under a belief that the trip to San Francisco was authorized. Granted that the members of the state board, if given the privilege of attending or sending its employees or officers to conferences outside of the state, would not abuse the privilege, yet the wonderful highways and streamlined automobiles and railway trains, with all expenses paid, are a great lure to be "going places" instead of telephoning or writing.

Justice LOCKWOOD in one sentence disposes of the question as to whether the legislature had made an appropriation to pay mileage of the members of the state board, its officers and employees to out-of-state meetings. He says:

"We think, however, that section 15 of chapter 69, *supra,* as amended by chapter 3 of the third special session of the thirteenth legislature, appropriates many thousands of dollars for the 'expenses' of the department, which of course includes legitimate travel expenses, and it is not claimed this fund is exhausted."

The statutes referred to do, indeed, appropriate funds to the state and county boards amounting to many thousands of dollars to pay the *expenses* of administering assistance to the aged, the needy, the blind, and dependent children of the state. The ex· penses provided for in chapter 69 are the traveling and other expenses actually incurred by the members of the state board while in the performance of their official duties (section 3), the salary of the commissioner for the state department, not to exceed $4,800

per annum, and the salaries of the employees of the state board. Section 4.

Under chapter 69 the county boards are given their "necessary traveling expenses while in the discharge of the duties imposed upon them by the State Board" (section 10 (a), the salary of a full-time secretary and such other employees as may be necessary for the discharge of the duties of the board. Section 10 (d). These are the only "expenses" for which chapter 69, as amended by chapter 3 of the third special session of the thirteenth legislature, has made appropriations, except those mentioned in subdivision (g), *supra.*

I do not hesitate to say that subdivision (g), *supra,* does not authorize travel out of the state at the expense of the state and that there is no appropriation for such travel.

Ordinarily I would apologize for setting forth my views at such length. I do it because I am deeply impressed with the fallacy of the reasoning of my colleagues. In the first place, to reach their conclusion that the state should pay the expenses claimed, it is presumed or assumed that by the general import of chapter 69 the legislature intended that trips outside of the state should be made. In the second place, it is assumed or presumed that the law implies that the legislature intended that the expenses of such trips should be paid. In the third place, although no one is given power to designate delegates to make such trips, the authority to do so, it is assumed is impliedly given to the commissioner, or— There is quoted to sustain such far-fetched conclusion what Chief Justice MARSHALL said about power to act in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421, 4 L. Ed. 579, 605, when the end to be accomplished is legitimate. It is not a question of power in the legislature to provide that such trips may be made and for the payment of their

expenses. If the legislature had provided for such travel and expenses, I certainly would not dissent, but the only body that has the power to provide who should attend out-of-state meetings and for their expenses has so framed chapter 69 as to forbid the state to pay claims for expenses of such trips.

I do not think Justice McALISTER'S concurring opinion, or that part of it analyzing section 28, Revised Code of 1928, although plausible, makes sense. He construes such section as requiring the auditor to issue her warrant if the governor specifically approves a claim, whether it is for an actual public purpose or not. It may be for a gambling debt and she may know it, yet she is, according to his view, to issue her warrant for it if the governor has approved it. I do not want to indict the legislature of such stupidity as that. He says the governor's judgment is conclusive so far as the auditor is concerned. It may be that if the auditor issued her warrant for a claim specifically approved by the governor, it would relieve her of civil liability, but if a claim appears not to be for a public purpose, and she refuses to issue her warrant, it seems to me the courts should sustain her. Indeed, under such circumstances, I believe the auditor could be enjoined from issuing the warrant. Justice McALISTER admits that the payment of such a warrant could be enjoined; in other words, after the horse is stolen he would close the door.

" . . . and no warrant shall be drawn thereon, unless the governor specifically approves the claim in whole or in part." (Section 28, *supra.*)

This phrase does not say that the warrant shall be issued if the governor approves the claim in whole or in part. If the governor approves it, the implication is that the auditor may issue the warrant but it lacks a whole lot of saying she must issue it.